```
 1                    UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
 2         -------------------------X
           UNITED STATES OF AMERICA,      Docket No. CR 09-129
 3                        Plaintiff,

 4              v.                       Washington, D.C.
                                         January 26, 2010
 5                                       9:40 a.m.

 6         LONNELL GLOVER #1,             MORNING SESSION
           JONATHAN WRIGHT #3,
 7                        Defendant.
           -------------------------X
 8
                         JURY SELECTION/TRIAL – DAY 2
 9             BEFORE THE HONORABLE ELLEN SEGAL HUVELLE
                      UNITED STATES DISTRICT JUDGE
10

11         APPEARANCES:

12         For the Plaintiff:    U.S. ATTORNEY'S OFFICE
                                 By:  Mr. Anthony F. Scarpelli
13                                    Mr. John K.Han
                                 555 Fourth Street, N.W.
14                               4th Floor
                                 Washington, D.C.  20530
15                               202.514.8707
                                 anthony.scarpelli@usdoj.gov
16                               john.han@usdoj.gov

17
           For the Defendant:    LAW OFFICES OF J.R. CONTE, PLLC
18         LONNELL GLOVER        By:  Mr. Joseph R. Conte
                                 400 Seventh Avenue, N.W.
19                               Washington, D.C.  20004
                                 202.638.4100
20                               dcgunlaw@gmail.com

21         JONATHAN WRIGHT       LOTZE MOSLEY, LLP
                                 By:  Ms. Nikke U. Lotze
22                               503 D Street, N.W.
                                 Suite 300
23                               Washington, DC  20001
                                 202.393.0535
24                               nlotze@lotzemosley.com

25
```

1    APPEARANCES:  (CONT'D.)

2    Court Reporter:          Catalina Kerr, RPR, CRR
                              U.S. District Courthouse
3                             Room 6509
                              Washington, D.C.  20001
4                             202.354.3258
                              *catykerr@msn.com*

5

6    Proceedings recorded by mechanical stenography, transcript

7    produced by computer.

8                              *-*-*-*-*

9

10                          C-O-N-T-E-N-T-S

11

12   GENERAL INSTRUCTIONS AND QUESTIONS BY THE COURT........  3

13   JURY SEATED.......................................... 42

14   COURT INSTRUCTIONS TO THE JURY....................... 46

15   OPENING STATEMENT BY MR. SCARPELLI................... 66

16   COURT REPORTER'S CERTIFICATE......................... 75

17

18

19

20

21

22

23

24

25

```
 1                    P-R-O-C-E-E-D-I-N-G-S

 2              (11:05 A.M.; OPEN COURT; DEFENDANTS PRESENT WITH

 3   THEIR ATTORNEYS; JURY PANEL NOT PRESENT.)

 4              (JUROR 299, LINE 24 EXCUSED FOR HEALTH REASONS.)

 5              THE COURT:  Before they bring them in, we have a new

 6   list.  We're not on the record at the moment.

 7              (JURY PANEL PRESENT.)

 8              THE COURT:  Good morning, ladies and gentlemen.

 9   You're a small group.  We did most of the jurors yesterday and

10   we just have a few more to go this morning.  So if we could

11   swear the panel, please.

12              THE DEPUTY CLERK:  Would the prospective jury panel

13   please rise and raise your right hand.

14              (PROSPECTIVE JURY PANEL SWORN BY THE DEPUTY CLERK.)

15              THE DEPUTY CLERK:  Thank you.  You may be seated.

16              THE COURT:  Good morning, ladies and gentlemen.  I

17   am Judge Ellen Segel Huvelle.  We are here now for the case of

18   United States versus Lonnell Glover, and the second Defendant

19   is Jonathan Wright.

20              Now, this, ladies and gentlemen, is a criminal case.

21   It has been brought by the United States.  What we're about to

22   do is known as the process of voir dire.  We do not mean to

23   pry into your private affairs, but these questions are

24   designed to assist you in finding jurors who will be fair and

25   impartial and who will decide this case solely on the evidence
```

1    you hear in the courtroom.

2            The procedure we will be following is that we will

3    have some general questions.  I will ask the question.  I'll

4    give you the question number.  If you have a "yes" answer to

5    any of my questions, kindly write down the question number

6    and -- on a three-by-five card.  Do you-all have that?

7            After we get through the general questions, we are

8    going to speak to each of you individually here at the bench.

9    The process should not take too long, but please be patient

10   with us.  It is important to the parties and the lawyers.

11           First, I'm going to tell you a little bit about this

12   case so that you can then answer my first question, which is

13   whether or not you know anything about the matter.

14           Mr. Conte, something for you?

15           MR. CONTE:  No.

16           THE COURT:  Okay.  This case is United States versus

17   Lonnell Glover and Jonathan Wright.  They are charged in a one

18   count indictment with conspiracy to distribute and possess

19   with intent to distribute 5 kilograms or more of cocaine.  The

20   relevant time period for this conspiracy charge is September

21   '07 through June 19th, '07.  It alleges that the defendants

22   conspired to purchase cocaine in the Bahamas and distribute

23   the cocaine in this area.

24           The -- I first would like to know whether anyone

25   here is familiar with the facts of this case.  That's Question

1    1.  If so, write down "1."

2              No. 2, I'm going to introduce you to the Government

3    attorneys.  First, Mr. Scarpelli.

4              MR. SCARPELLI:  Good morning.

5              THE COURT:  And Mr. Han, if anyone knows or

6    recognizes either gentlemen, put down "2."

7              Now, the Defense counsel, Mr. Joseph Conte

8    represents Lonnell Glover.

9              MR. CONTE:  Good morning, ladies and gentlemen.

10             THE COURT:  And Ms. Nikke Lotze of the firm of

11   Mosley & Lotze -- or Lotze & Mosley -- Lotze & Mosley,

12   sorry -- represents Mr. Jonathan Wright.

13             If you know -- recognize either of their names or

14   the firm, could you kindly put down "3."

15             Now I'll ask Mr. Conte the Question No. 4.  Would

16   you introduce your client and Ms. Lotze will introduce hers.

17             MR. CONTE:  Ladies and gentlemen, I represent

18   Lonnell Glover, who's a life-long resident of this area,

19   mostly from Maryland.

20             COURT REPORTER:  I'm sorry, Mr. Conte, you're going

21   to have to speak up a little louder, too.

22             MR. CONTE:  Sorry.

23             THE COURT:  You can use the mic.

24             MR. CONTE:  He's a life-long resident of this area,

25   mostly from Maryland, and I would ask if anybody knows

1  Mr. Glover.

2          THE COURT:  If you do recognize him, put down "4."

3          MS. LOTZE:  Good morning, ladies and gentlemen.  I

4  have the pleasure of representing Jonathan Wright who's a

5  34-year-old resident of Fort Lauderdale, Maryland, where he's

6  employed as an auto mechanic.

7          THE COURT:  All right.  If anyone knows --

8          MS. LOTZE:  Fort Lauderdale, Florida.

9          THE COURT:  -- or recognizes either person, please

10 let me know by writing down "4."

11         Now, the next couple of questions have to do with

12 the principles of law that we will be applying in this case,

13 and I'd like to know if anyone would not be willing to apply

14 these principles.

15         Defendant, as you know, has been charged in an

16 indictment.  An indictment is just a formal way of informing a

17 defendant of the nature of the charges against him.  You are

18 not to consider the indictment as any indication of guilt.  In

19 a criminal trial, every defendant is presumed to be innocent.

20 This presumption remains with him throughout the trial unless

21 and until he is proven guilty beyond a reasonable doubt.

22         The burden of proving a defendant guilty beyond a

23 reasonable doubt never shifts throughout the trial.  It rests

24 solely with the Government, that is, the prosecutors here, and

25 a defendant does not have to prove his innocence, produce any

1    evidence or testify.

2         Now, those are the principles of law that will

3    underlie the trial of this case.  Is there anyone here who

4    feels that they would be unable or unwilling to follow those

5    principles if selected?  If so, put down "5."

6         Question 6, if it should come to pass, after you

7    have heard all of the evidence, the arguments of the lawyers,

8    and my instructions on the law, if you are then persuaded by

9    the trial that the Defendant is guilty of the charges beyond a

10   reasonable doubt, it will be your duty to vote guilty.

11        Is there anyone here who feels that they would be

12   unable to carry out that duty?  If so, write down "6."

13        Now, No. 7.  On the other hand, if after you have

14   heard all the evidence, the arguments of the lawyers, and my

15   instructions on the law, if you then have a reasonable doubt

16   as to a defendant's guilt of the charge, you must vote "not

17   guilty."

18        Is there anyone here who feels that they would be

19   either unwilling or unable to carry out this responsibility?

20   If so, write down number "7."

21        Now, we're going to introduce to you the witnesses.

22   We'll have the -- these may be a longer list than will

23   actually testify, I'm sure, but if you could use the mic,

24   Mr. Han or Scarpelli, and identify, the best you can, the

25   witnesses.

1      If anyone recognizes the name of anyone who's about

2   to be introduced to you by name, kindly write down "8."

3      MR. HAN:  Good morning.  The following will be

4   Government witnesses that you may hear from or hear about.

5   The first is John Bevington from the FBI.  Keith Bradley from

6   ICE, which is immigrations and customs enforcement.  Robert

7   Edelin from the Metropolitan Police Department, MPD.  Michael

8   Eames from MPD.  William McDermott, FBI.  Brian Mumford, FBI.

9   Steve Naugle, FBI.  Ryan Pardee, FBI.  Aleta Thompson, FBI.

10  Angel Vargas, customs and border protection.  Frank Vetere,

11  retired FBI.  Scott Wiegman, FBI.  Francisco Corral,

12  Transportation and Security Administration, TSA.  Laura

13  Griffin, TSA.  Mark Hessey, who's a civilian.  Dionicio

14  Peralta with TSA.

15      You may also hear from some experts, including

16  Christopher Chang, who is a DEA chemist, Drug Enforcement

17  Administration.  Connie Klinkam who is a DEA chemist.  Kevin

18  Stanfill who is a DEA agent in Miami.  Anthony Washington who

19  is with the Metropolitan Police Department.

20      You may also hear from the following witnesses or

21  hear about these following witnesses:  Christian Donaldson,

22  Robert Robbins, Dianne Holmes.

23      I can also say the names of the search warrants, the

24  locations of the search warrants.

25      THE COURT:  No, let's wait till Question 22, if you

1    don't mind.

2           Now, anybody who recognizes those names or thinks

3    they might, write down "8," and the same for the following

4    names that Mr. Conte will give us.

5           MR. CONTE:  Ladies and gentlemen, you may hear from

6    or hear the names Timothy Johnson.  He's a lifelong D.C.

7    resident who currently lives in Maryland.  Arnold Giesmann

8    who's a long-term D.C. resident, formerly with the Food and

9    Drug Administration, now lives in southeast Washington.  And

10   George Steele, resident of Maryland and a former metropolitan

11   police officer.

12          THE COURT:  Anyone further?

13          All right.  Ladies and gentlemen, those names, if

14   you recognize them, please write down "9" -- I mean, sorry,

15   "8."  My mistake, "8."

16          Question 9, though, is, as you can tell, they are

17   going to be law enforcement people testifying here.  Under the

18   law, a law enforcement officer is to be given the same amount

19   of believability or credence as any other witness.  They are

20   not to be given any greater or lesser weight because of their

21   job title.  Therefore, the Court will be instructing you that

22   you should treat them like other witnesses, listen to what

23   they say and decide whether you believe them based on what you

24   hear in the courtroom.

25          Is there anyone here who feels that they would not

1   be able to follow that principle of law and would treat police

2   officers different because of their job?  If so, write down

3   "9."

4           Question 10.  This question applies to yourselves,

5   members of your immediate family and close personal friends.

6   Immediate family are your parents, siblings, significant other

7   or children, not your aunts or uncles or cousins.  But we want

8   to know whether anybody in that group has previously, is

9   presently, or is applying to become a member of law

10  enforcement.  That's broadly defined to include a police

11  department here or anywhere else, special police officers,

12  prosecutor's office, U.S. attorneys, corporation counsel or

13  Attorney General's office, correctional officers, Department

14  of Justice, U.S. Marshal Service, sheriff's department,

15  Internal Revenue, Secret Service, probation parole or the

16  court systems.  If you have friends, immediate relatives,

17  yourself in that category, right down "10."

18          Question 11, we want to know whether any of your

19  friends, either you, your close personal friends or immediate

20  relatives -- excuse me -- are currently or previously employed

21  by a criminal defense lawyer or who have been involved in any

22  way in criminal defense work.  If so, write "11."

23          12, I'd like to know if any of you are lawyers or

24  studied law in law school.

25          13, I'd like to know whether anyone here has ever

1  been on a grand jury.  This is what's called a petit jury.

2  Grand jury is where the Government only presents evidence.

3  The burden of proof is much lower.  If you've ever been on a

4  grand jury, write "13."

5           14.  Has anyone here served before as a juror in a

6  criminal case, not civil, but criminal?  If you have, and it

7  doesn't matter what court, write down "14."  A criminal case

8  is one prosecuted by the state or U.S. attorneys or federal

9  government and the charge is a criminal offense.

10          15.  Have any of you within the last five years

11 belonged or participated in any crime prevention group such as

12 a neighborhood watch organization, Orange Hats or other crime

13 prevention group, that's 15.

14          Now, 16, we want to know whether you, members of

15 your immediate family, or close personal friends, whether

16 anybody in that group has either been a victim of, a witness

17 to, or been charged or convicted or arrested for any kind of

18 drug-related offense.  That's you, members of your immediate

19 family and close personal friends, have any of them been a

20 victim of, a witness to or charged, convicted, arrested for a

21 drug-related offense.  If so, put down 16.

22          17, has any member here either been a victim of, a

23 witness to, or arrested or convicted of any offense that you

24 think would be -- affect you in such a way as to interfere

25 with your ability to be fair and impartial?  I'm going to

1   repeat 17.

2        We want to know whether you, members of your

3   immediate family or close personal friends have been the

4   victim of, witness to, or arrested or convicted for any

5   offense that you feel would be -- interfere with your ability

6   to be fair and impartial.  If so, write down "17."

7        18.  As you know, this case does involve an

8   allegation regarding cocaine, both possession with intent to

9   distribute and distribution.  We are not here as a referendum

10  on the laws about drugs, rather the job of a jury is to figure

11  out whether or not the Government proves their case factually

12  beyond a reasonable doubt.  But if anyone here has such strong

13  feelings you doubt the nature of the charges here, one way or

14  another, that you think it would be -- prevent you from

15  rendering a fair and impartial verdict, being fair to both

16  sides, please write down "18."

17        No. 19.  To reach a verdict, everyone has to agree

18  on the verdict, that is, it must be unanimous.  In

19  deliberations, you must consider the opinions and points of

20  view of your fellow jurors.  In the final analysis, you must

21  follow your own conscience and be personally satisfied with

22  any verdict.  Is there anyone here who thinks they'd have

23  difficulty expressing their own opinions and thoughts about

24  this case to your fellow jurors during deliberations?  If so,

25  that's No. 19.

1          Now, No. 20, we are hoping that the testimony in
2   this case will be concluded within two weeks.  I cannot
3   guarantee the time for deliberations, so I will ask about the
4   following -- to keep in mind about three weeks.  That's very
5   generous.  I don't think it will take us that long, but to be
6   on the safe side, I understand that jury service is an
7   inconvenience for all of you.  We cannot run the courts
8   without you.  It's one of your highest civic duties, and I can
9   only excuse you for something that would constitute a
10  substantial hardship.

11          So, if you have any health problems that would
12  interfere with you sitting as a juror, if you have -- if
13  you're taking medication and you feel that you could not stay
14  awake, if you have any religious or moral or ethical
15  convictions that would interfere with your being a juror or
16  any other substantial hardship, please write down "20."

17          As to 21, I want to know whether there's any reason
18  that you can think of that for -- that you would not be able
19  to be a fair and a -- fair and impartial juror in this case
20  and listen to the evidence and decide the case based on the
21  evidence.  If so, write down "21."

22          Now I'm going to list for you a couple of locations,
23  or the Government will.  This is Question 22.  And if anyone
24  lives or works right in the immediate area, could you write
25  down "22."

1          MR. HAN:  Thank you, Your Honor.  There are three

2    locations that you may hear about during the course of this

3    trial.  One is 4000 10th Street, Northeast in Washington,

4    D.C.  Second is 2518 Q Street, Southeast, and the third is

5    4908 Brentley Road in Temple Hills, Maryland.

6          THE COURT:  Bentley Road?

7          MR. HAN:  Brentley.

8          THE COURT:  Brent, I'm sorry?

9          MR. HAN:  Brentley.

10         THE COURT:  Oh, Brent, B-R?

11         MR. HAN:  Brent, B-R-E-N-T --

12         THE COURT:  -- L-E-Y.  All right.  That's in Temple

13   Hills?

14         MR. HAN:  Yes, Your Honor.

15         THE COURT:  If you're close by to those -- any of

16   those areas, could you write down "22."

17         Now, Mr. Mazzitelli, who is sitting right over

18   there -- Yes?

19         JUROR:  Would you ask him to please repeat the first

20   location?

21         THE COURT:  Sure.  I can do it.  4000 10th Street,

22   Northeast.  Brentwood, sort of?  Correct, Mr. Han?

23         MR. HAN:  That's correct, Your Honor.

24         THE COURT:  Not too far from Catholic, right?

25         I'm sorry.  Mr. Mazzitelli has just walked in.  He

1    is assisting the prosecutors.  So if anyone knows him, you got

2    to answer the question -- let's see -- we put him back in

3    Question 3 -- 2, sorry.  2.  If anybody knows Mr. Mazzitelli,

4    he should -- write down "2."

5              Okay.  Anything further for the counsel?

6              MR. HAN:  Nothing from the Government, Your Honor.

7              MS. LOTZE:  Not for Mr. Wright.

8              MR. CONTE:  Not on behalf of Mr. Glover.

9              THE COURT:  All right.  At this time, we're going to

10   talk to each of you rather briefly, and we'll collect your

11   cards.

12             THE DEPUTY CLERK:  You want to use the husher

13   system.

14             THE COURT:  Yeah -- No.  It's easier the other way,

15   I think.

16             We are going to move you first so you can all sit

17   next door and that way the counsel can remain seated.

18             The first person can just stay.

19             (PAUSE.)

20             (JUROR 0067 ON THE STAND.)

21             THE COURT:  Good morning.  If you don't mind sitting

22   here.  Thank you.  How are you?

23             JUROR:  Fine.

24             THE COURT:  You answered just one question about law

25   enforcement connection, No. 10, I think.

 1                 JUROR:  Yeah.

 2                 THE COURT:  Who do you know?  I don't need the

 3     names, but -- Yeah.

 4                 JUROR:  My father worked for the D.C. correction --

 5     well, he did.  He's passed on.

 6                 THE COURT:  Okay.  He was a correctional officer?

 7                 JUROR:  Yes.

 8                 THE COURT:  How long did he do that?

 9                 JUROR:  36 years.

10                 THE COURT:  Good for him, wow.  Would that in any

11     way make you more favorably disposed to the Government's case

12     here?

13                 JUROR:  No, ma'am.

14                 THE COURT:  You can be fair to both sides?

15                 JUROR:  Yes.

16                 THE COURT:  And what kind of work -- are you working

17     now?

18                 JUROR:  No.

19                 THE COURT:  What did you do last when you last

20     worked?

21                 JUROR:  Childcare provider.

22                 THE COURT:  Okay.  Mr. Conte.

23                 MR. CONTE:  Ma'am, you're Juror No. 0067?

24                 THE COURT:  Correct.

25                 JUROR:  Yes.

1    THE COURT:  Anything else, Counsel?

2    MS. LOTZE:  Just one.  Good morning, ma'am.

3    JUROR:  Good morning.

4    MS. LOTZE:  Just because we weren't provided really

5    any information about your past employment, I was curious

6    whether the childcare you provided was with an agency or

7    privately.

8    JUROR:  It was private.

9    MS. LOTZE:  Okay.  And have you lived in D.C. all

10   your life?

11   JUROR:  Yes.

12   MS. LOTZE:  And have you ever served on a jury

13   before?

14   JUROR:  No.

15   MS. LOTZE:  Okay.  Have you been called for service?

16   JUROR:  Yes.

17   MS. LOTZE:  And just never selected?

18   JUROR:  No.

19   MS. LOTZE:  Okay, thanks.

20   THE COURT:  Mr. Han.

21   MR. HAN:  I understand you're not working presently,

22   but how do you spend your time during the days?

23   JUROR:  I take care of my grandchildren.

24   MR. HAN:  Thank you, Your Honor.

25   THE COURT:  Okay.  I think -- where would you like

1    the juror to go at this point?

2              THE DEPUTY CLERK:  To go back to the jury room.

3              THE COURT:  Okay.  We'll be back in touch very

4    shortly.  Could you just return to the jury room and wait for

5    us there?  Thank you.

6              (JUROR 0067 LEAVES COURTROOM.)

7              THE COURT:  Next one is 0841.  No answers.

8              THE DEPUTY CLERK:  Next one is 0841.  Juror

9    No. 0841.

10             (JUROR 0841 ON THE STAND.)

11             THE COURT:  Good morning, how are you?

12             JUROR:  Doing well.  Thank you.

13             THE COURT:  You didn't have any "yes" answers, but

14   can I ask, are you working?

15             JUROR:  Yes.

16             THE COURT:  What kind of work?

17             JUROR:  I work for a nonprofit here in town.

18             THE COURT:  What kind?

19             JUROR:  Environmental advocacy.

20             THE COURT:  All right.  And what is your job?

21             JUROR:  I'm basically a lobbyist.

22             THE COURT:  Okay.  Have you lived in Washington

23   long?

24             JUROR:  Six-and-a-half years.

25             THE COURT:  Okay.  And never been on a jury before?

1          JUROR:  No, never even actually been called.

2          THE COURT:  Well, welcome to the courts.

3          JUROR:  Thanks.

4          THE COURT:  Okay.  Let's see if I get the right --

5   questions, Mr. Han?

6          MR. HAN:  Nothing from the Government.

7          THE COURT:  For Defense?

8          MS. LOTZE:  Not on behalf of Mr. Wright.

9          MR. CONTE:  Not on behalf of Mr. Glover, Your Honor.

10          THE COURT:  Okay.  We'd ask that you go to the jury

11   office and wait.  We'll be back in touch very shortly.  Okay?

12          JUROR:  Okay.

13          THE COURT:  Back across the way.

14          (JUROR NO. 0841 LEAVES COURTROOM.)

15          THE COURT:  0404, No. 10 only.

16          THE DEPUTY CLERK:  Juror No. 0404.

17          (JUROR NO. 0404 ON THE STAND.)

18          THE COURT:  Good morning, how are you?

19          JUROR:  Good morning.

20          THE COURT:  You answered No. 10.  Do you have some

21   law enforcement connection?

22          JUROR:  Yes, my twin sister is a special police

23   officer.

24          THE COURT:  Where?

25          JUROR:  Jenkins Security.

1        THE COURT:  And where is she assigned most of the

2   time?

3        JUROR:  Washington, D.C.  I'm not sure exactly

4   where.

5        THE COURT:  And what do you do?  Do you work?

6        JUROR:  I work for St. Elizabeth Hospital.

7        THE COURT:  In what capacity?

8        JUROR:  I'm a forensic psychiatric technician.

9        THE COURT:  What does that mean?

10       JUROR:  Working with individuals who was found not

11   guilty by reason of insanity.  I assist with daily living to

12   get them back into the community.

13       THE COURT:  I see.  Wonderful.

14       Any reason you can't be fair and impartial in this

15   case?

16       JUROR:  No.

17       THE COURT:  Do you have any preconceived notions

18   about defendants, since you work with people who may have been

19   in the system at some point?

20       JUROR:  No.

21       THE COURT:  Okay.  Questions?

22       MS. LOTZE:  Not on behalf of Mr. Wright.

23       MR. CONTE:  I just wonder, do you enjoy your work?

24       JUROR:  Yes.

25       MR. CONTE:  All right.  Thank you.  Nothing further,

1   Your Honor.  Thank you.

2            THE COURT:  Sir?

3            MR. HAN:  No questions, Your Honor.

4            THE COURT:  Thank you.  If you go across the

5   street -- across the hall to the jury office, we'll be with

6   you shortly.  Okay?  Thank you.

7            (JUROR 0404 LEAVES COURTROOM.)

8            THE COURT:  337, No. 10.

9            THE DEPUTY CLERK:  Juror No. 337.

10           (JUROR 0337 ON THE STAND.)

11           THE COURT:  Good morning.  How are you, sir?

12           JUROR:  Good morning, Your Honor.  How are you?

13           THE COURT:  Good.  Now, you answered two of our

14   questions, No. 14, you've been on a jury before.

15           JUROR:  No, I only answered one of them.

16           THE COURT:  What number is your -- let's see.

17           JUROR:  0337.

18           THE COURT:  You answered 10.  What's your law

19   enforcement connection?  Sorry.

20           JUROR:  My mother was a deputy prosecutor for about

21   ten years.

22           THE COURT:  Where was that?

23           JUROR:  In Washington state.

24           THE COURT:  And what do you do?

25           JUROR:  I work for an energy nonprofit.

1            THE COURT:  And what exactly do you do there?

2            JUROR:  I'm director of operations.

3            THE COURT:  It's amazing how many people actually

4   are involved in the environmental-type work.  Is that what the

5   energy nonprofit means?

6            JUROR:  It is.  It's energy security and

7   environmental work.

8            THE COURT:  Can you be fair and impartial to both

9   sides?

10            JUROR:  Yes.

11            THE COURT:  Questions?

12            JUROR:  No, Your Honor.

13            THE COURT:  How about them?  They get a chance, too.

14            MS. LOTZE:  Good morning, sir.

15            JUROR:  Good morning.

16            MS. LOTZE:  So your mother, you said, was a deputy

17   prosecutor in Washington state?

18            JUROR:  That's correct.

19            MS. LOTZE:  Deputy prosecutor.  Is that any

20   different from -- did she go to court day-to-day, try cases,

21   things like that?

22            JUROR:  She did.

23            MS. LOTZE:  Did she talk to you at all about her

24   work?

25            JUROR:  She did.

```
 1              MS. LOTZE:  What -- did you learn any -- well, did

 2    anything you learned as a result of your mom talking to you

 3    about her work cause you to have any view about cases that go

 4    to trial as opposed to cases that are disposed of prior to

 5    trial or the strength of the Government's case or any other

 6    sort of knowledge that you would bring that would be sort of

 7    particular to what you learned from your mom?

 8              JUROR:  I don't believe so.  I don't think that I

 9    would be biased based on my experience with her as a

10    prosecutor.

11              THE COURT:  How about anything else?

12              JUROR:  Biased about anything else?  No.

13              THE COURT:  Or any other reason.  Okay.

14              MS. LOTZE:  Did -- sorry.  Did your mother speak to

15    you about the role of a defense attorney, what it was like to

16    be in court with opposing counsel, anything like that?

17              JUROR:  I mean, she had relationships with both

18    people on the government's side and the defense attorney's

19    side.  At one point she was also a defense attorney.

20              MS. LOTZE:  And when you say relationships, she was

21    friendly with people who did both?

22              JUROR:  Right.

23              MS. LOTZE:  How old were you when she stopped doing

24    that work, or is she still doing that work?

25              JUROR:  It was about when I graduated from high
```

 1    school, so about 18.  She's no longer a prosecutor.

 2              MS. LOTZE:  Did she go from prosecuting to defense

 3    work or from defense to prosecuting?

 4              JUROR:  From defense to prosecuting.

 5              MS. LOTZE:  Thank you.

 6              THE COURT:  Questions.

 7              MR. CONTE:  Nothing on behalf of Mr. Glover, Your

 8    Honor.

 9              THE COURT:  Okay.

10              MR. HAN:  Nothing for the Government.

11              THE COURT:  Thank you, sir.  You should go to the

12    jury office and we'll be in touch shortly.  Thank you.

13              (JUROR 0337 LEAVES COURTROOM.)

14              THE DEPUTY CLERK:  Next is 0546.  Juror 0546.

15              THE COURT:  Okay.  This is 14 and 16.

16              (JUROR 0546 ON THE STAND.)

17              THE COURT:  Good morning, sir.  How are you?

18              JUROR:  Good morning.

19              THE COURT:  Now, you indicated that -- a couple of

20    answers, 14.  You've been on a jury before?

21              JUROR:  Yes.

22              THE COURT:  Criminal case?

23              JUROR:  Both criminal and civil.

24              THE COURT:  Okay.  And where was -- where was the

25    case, here across the street or --

```
 1              JUROR:  One was here, several were in superior

 2    court.

 3              THE COURT:  Do you remember the charges, what kind

 4    of criminal charges?

 5              JUROR:  Criminal charges, almost all having to do

 6    with drugs and guns.

 7              THE COURT:  Okay.  Anything about those experiences

 8    that you think would impact you here in any way in terms of

 9    your ability to be fair and impartial?

10              JUROR:  No.

11              THE COURT:  I don't want to know what the verdict

12    was, but in the juries that you sat on, did they reach

13    verdicts?

14              JUROR:  Yes.

15              THE COURT:  Okay.  And you also indicated that you

16    have been a victim, witness, charged or convicted with some

17    kind of drug-related offense?

18              JUROR:  Yes.

19              THE COURT:  Can you tell us a little bit about that.

20              JUROR:  My daughter, who's 26, was arrested for

21    possession of a small amount of coke -- of marijuana in

22    Fairfax County.  She pleaded guilty.  She was directed to drug

23    awareness training, and she has a permanent arrest record for

24    that.

25              THE COURT:  Okay.  Do you harbor any ill will
```

1    against the Government or prosecutors as a result?

2           JUROR:  No.  Other than that we were not able to

3    expunge the arrest record for so minor a crime.

4           THE COURT:  Okay.  You think you can be fair and

5    impartial to both sides here?

6           JUROR:  Yes.

7           THE COURT:  Questions, Mr. Han?

8           MR. HAN:  Nothing from the Government, Your Honor.

9           MS. LOTZE:  Good morning.

10          JUROR:  Good morning.

11          MS. LOTZE:  In the -- in the incident with your

12   daughter, did you feel she was treated fairly by the

13   Government?

14          JUROR:  Yes.  Under the rules, apparently.

15          MS. LOTZE:  All right.  And did you have any

16   interaction with the person representing her, her lawyer?

17          JUROR:  No.  Actually she -- she handled it without

18   notifying me before the fact.

19          MS. LOTZE:  Okay.  Did she let you know -- did she

20   form any impressions about defense attorneys that she reported

21   to you after the incident?

22          JUROR:  No, other than she thought it was unfair

23   that we couldn't expunge the arrest record.

24          MS. LOTZE:  All right.  Perhaps you told us this.

25   How long ago did that happen?

1           JUROR:  Two years ago.

2           MS. LOTZE:  And we're told here that you work for

3   the Department of Transportation.  Can you say a little bit

4   more about your day-to-day?

5           JUROR:  Yes, I'm a transportation planner, and I

6   review the plans for major public transportation projects

7   around the country prior to their being approved for funding.

8           MS. LOTZE:  All right.  And in your prior experience

9   on jury service, was there anything specifically about the

10  deliberation process that you think would affect you in

11  deliberations from here forward, is there anything that went

12  as -- you know, differently than you thought it should or --

13  no?

14          THE WITNESS:  No.

15          MS. LOTZE:  Okay.  Thank you.

16          MR. CONTE:  Nothing on behalf of Mr. Glover, Your

17  Honor.

18          THE COURT:  Okay.  Nothing with Government?

19          MR. HAN:  Nothing, Your Honor.

20          THE COURT:  Thank you, sir.  You should go across

21  the way to the jury office, and we'll be with you shortly.

22          JUROR:  Okay.

23          (JUROR 0546 LEAVES COURTROOM.)

24          THE DEPUTY CLERK:  0660.

25          THE COURT:  8, 10, 11, 12.

1          (JUROR 0660 ON THE STAND.)

2          THE COURT:  Good morning, sir.  Excuse me.

3          JUROR:  Good morning.

4          THE COURT:  Now, you indicated -- let's see, I'm

5  sorry, 8, 10, 11, 12.

6          You are a lawyer?

7          JUROR:  Yes.

8          THE COURT:  What kind of law?

9          JUROR:  I practice alcohol beverage regulatory law.

10  I represent a wine trade association.  But I previously was at

11  a law firm, did pro bono work in immigration, dealt with ICE

12  and dealt with customs border patrol, which is why I thought I

13  might have recognized some of the names.

14          THE COURT:  Yeah.  There was one or two ICE people

15  on that list.  Can you remind me?

16          MR. HAN:  The ICE agents are Keith Bradley and the

17  Transportation Security Administration people are Mr. Corral,

18  Peralta, and Angel Vargas all out of the Miami area.

19          JUROR:  I wasn't sure if I recognized their names or

20  not.  It's been a few years since I've handled those cases.

21          THE COURT:  Okay.  I'm sorry.  Is your involvement

22  in any of those kinds of cases in any way, you think, would

23  interfere with your ability to be fair and impartial?

24          JUROR:  Not that I believe.  I have also -- but to

25  be absolutely clear, I've also handled some defense work for

1    some criminal case I did.  I did handle a pro bono capital

2    murder.

3              THE COURT:  Uh-huh.  Where were you working

4    before --

5              JUROR:  McDermott, Will & Emery.

6              THE COURT:  And would that in any way impact your

7    ability --

8              JUROR:  Not that I believe.  I don't believe so.

9              THE COURT:  You also said that you know people in

10   law enforcement and criminal defense work.

11             JUROR:  Well, my father was a district attorney, and

12   I knew a lot of the DAs or assistant DAs in Suffolk County,

13   New York growing up, some of whom are now judges.  I also have

14   a friend who is a public defender in Georgia.

15             THE COURT:  Okay.  And so that's the defense side

16   that you were mentioning?

17             JUROR:  Yes.

18             THE COURT:  The witnesses, are there any that you

19   specifically recognize, or you just concerned you might -- any

20   names --

21             JUROR:  I was concerned I might remember or have had

22   dealings with them.

23             THE COURT:  Okay.  All right.  Let's see.  I think

24   that was -- you're the lawyer.  Okay.  Questions?  The

25   defense?

1        MR. CONTE:  If it came to pass that you did

2   recognize one or two of these witnesses, would that impact

3   your ability to be fair and impartial?

4        JUROR:  I don't believe so.  If it was, it would

5   have been a passing connection several years ago related to

6   another matter that is no longer even pending, so...

7        MR. CONTE:  Nothing further.  Thank you, Your Honor.

8        THE COURT:  Okay.  Mr. Han.

9        MR. HAN:  Did you do any immigration or criminal

10   work out of Miami, that came from Miami?

11        JUROR:  Well, we didn't, although, you know, there's

12   always -- it was mostly in Virginia was all the work, although

13   I did have -- there were things that we -- we had offices all

14   over the country, so I ended up dealing with things that were

15   in many different places.

16        MR. HAN:  You mentioned you did some criminal pro

17   bono work.  Any of that involve narcotics-related cases?

18        JUROR:  No.

19        MR. HAN:  Thank you, Your Honor.

20        THE COURT:  Nothing else.  Okay.  That's fine.  If

21   you would go to the jury office across the hall.  We'll be

22   with you very shortly.  Thank you.

23        (JUROR 0660 LEAVES THE COURTROOM.)

24        THE COURT:  Next one is 13 and 20.

25        THE DEPUTY CLERK:  0658.

1              (JUROR 0658 ON THE STAND.)

2              THE COURT:  Good morning.

3              JUROR:  Good morning.

4              THE COURT:  How are you?  I'm just going to follow

5      up a little bit on your answers.  Excuse me.  You said that

6      you might have some kind of hardship.  What did you have in

7      mind?

8              JUROR:  I'm scheduled for outpatient surgery on

9      February 16th.

10             THE COURT:  If I'm here on this case on

11     February 16th, I will be very surprised.  I don't think

12     that's a problem whatsoever.  I really do expect our dates

13     will be correct.  Do you have anything before the 16th of

14     concern?

15             JUROR:  No.

16             THE COURT:  Okay.  And you also said -- let's see,

17     Question 13 is -- you have been on a grand jury.

18             JUROR:  Yes, ma'am.

19             THE COURT:  Where was that?

20             JUROR:  Here in D.C.

21             THE COURT:  And you understand that the burden of

22     proof here is different?

23             JUROR:  Correct.

24             THE COURT:  Beyond a reasonable doubt, both sides

25     are here, it's not just the Government presenting a case for

1    probable cause.  You understand the difference?

2             JUROR:  Yes, ma'am, I understand that.

3             THE COURT:  And can you be fair and impartial to

4    both sides?

5             JUROR:  Yes.

6             THE COURT:  The surgery is the 16th, right?

7             JUROR:  Yes, ma'am.

8             THE COURT:  Okay.  Very good.  That's not a problem.

9             Okay.  Any questions, Ms. Lotze?

10            MS. LOTZE:  Good morning, ma'am.

11            JUROR:  Good morning.

12            MS. LOTZE:  We are told here that you're retired?

13            JUROR:  Yes, ma'am.

14            MS. LOTZE:  Can you tell us what you used to do.

15            JUROR:  I was a professional speaker.

16            MS. LOTZE:  Okay.  Could you say a little bit more

17   about that?

18            JUROR:  Well, people hired me to do training and to

19   do keynote speeches, retreats, and they would hire me and I

20   would go and I would speak on --

21            MS. LOTZE:  In what sort of area.

22            JUROR:  Motivational topics and time management.

23            MS. LOTZE:  You said, I'm sorry, motivational

24   topics.

25            JUROR:  Right.

1          MS. LOTZE:  And time management.

2          JUROR:  And time management and some stress

3     management.

4          MS. LOTZE:  Had you published in that area?  How did

5     you become known as a person with expertise in that area?

6          JUROR:  Well, basically, I had been a high school

7     principal, and when I moved into speaking, I started out as a

8     motivational speaker, and I was asked to speak on these

9     topics.  And I read up on those topics and spoke on them.

10          MS. LOTZE:  All right.  All right.  Thanks.

11          THE COURT:  Anything else?  Mr. Han?

12          MR. HAN:  Good morning.

13          JUROR:  Good morning.

14          MR. HAN:  As a motivational speaker, coming from

15     high school, did you have any speeches involving keeping kids

16     out of drugs, the DARE program, anything along those lines?

17          JUROR:  No.  Mainly my job as a high school

18     principal was to deal with the teachers and discipline,

19     primarily keeping them from running in the halls.

20          THE COURT:  Where did you -- where were you a

21     principal?

22          JUROR:  In Chicago.

23          THE COURT:  Oh, really.  What school, what level?

24          JUROR:  High school and elementary school

25     principals.

1          THE COURT:  My daughter is about to become a vice

2     principal in Chicago elementary.

3          JUROR:  Chicago is an exciting place and a great

4     place to have that job.

5          THE COURT:  Really?

6          JUROR:  I think so.

7          THE COURT:  How long -- this is unrelated, but how

8     long did you do this?

9          JUROR:  Eight years.

10          THE COURT:  And when did you leave?

11          JUROR:  In the mid '80s.

12          THE COURT:  She's in an elementary school in

13     Woodlawn right now as a sort of intern.  She was sent by

14     Chicago to give a -- she had taught, but...

15          JUROR:  It's very rewarding.

16          THE COURT:  Well, good.  I hope so.  The bureaucracy

17     is a little daunting.

18          JUROR:  Yes.

19          MR. HAN:  Ma'am, what type of groups hired you to

20     speak for them or speak to them?

21          JUROR:  Corporations, associations -- associations,

22     for example, would have conventions or conferences and would

23     call on me to speak.  I spoke to small groups as small as

24     Kiwanis and Rotary and then larger groups, up to -- I think

25     2,000 was my largest audience.

1          MR. HAN:  Can you give me some of the topics that

2   you spoke about.  I know you said generally motivational

3   speaking.  Was there anything more specific?

4          JUROR:  Well, in motivational speaking, it's

5   basically all the same.  It's just the title of your topic is

6   designed to key in to interests of the audience.  For example,

7   if I were talking to a sales group, I'd be speaking to them

8   about getting themselves revved up to go out and make sales,

9   how to close the sales, how to touch bases with the customer.

10  But if I were talking to a lawn care group, I'd talk to them

11  about -- I'd have more of an ecological focus, and I talk to

12  them about the rewards of nurturing plants and the

13  environment.

14         MR. HAN:  Any groups that involve the criminal

15  justice system, you know, probation departments or law

16  enforcement, neighborhood watch programs, anything that

17  touches on criminal justice issues?

18         JUROR:  Not that I can remember.

19         MR. HAN:  Thank you.  That's all I have, Your Honor.

20         THE COURT:  Okay.  Thank you.  If you would, go to

21  the jury office.  We'll be with you shortly.

22         JUROR:  Okay.  Thank you.

23         THE COURT:  Thank you.

24         (JUROR 0658 LEAVES THE COURTROOM.)

25         THE DEPUTY CLERK:  0385.

```
 1                    THE COURT:  Okay.  14.  This is the last.

 2                    (JUROR 0385 ON THE STAND.)

 3                    THE COURT:  Good morning, how are you?

 4                    JUROR:  Good morning.

 5                    THE COURT:  You answered one of our questions.

 6   You've been on a jury before?

 7                    JUROR:  Uh-huh.

 8                    THE COURT:  Can you tell me what kind of case?

 9                    JUROR:  Drugs.

10                    THE COURT:  Was it here or across the street?

11                    JUROR:  Here.

12                    THE COURT:  Anything about that experience that

13   would interfere with your ability to be fair and impartial

14   here?

15                    JUROR:  No.

16                    THE COURT:  Do you think you can give both sides a

17   fair trial?

18                    JUROR:  Yes.

19                    THE COURT:  What kind of work do you do?

20                    JUROR:  I work for a senator.

21                    THE COURT:  And what do you do for the senator?

22                    JUROR:  I manage his mail.

23                    THE COURT:  Okay.  How long have you been doing

24   that?

25                    JUROR:  About 23 years.
```

 1              THE COURT:  Oh, really.  Okay.  The -- Mr. Han,

 2   questions?

 3              MR. HAN:  Does the senator you work for, is he or

 4   she on any committees that deal with criminal justice issues?

 5              JUROR:  No.

 6              MR. HAN:  Sentencing reform, mandatory minimums,

 7   anything along those lines?

 8              JUROR:  No.

 9              MR. HAN:  Thank you, Your Honor.

10              MR. CONTE:  Nothing for Mr. Glover.

11              THE COURT:  Where is the senator from?

12              JUROR:  Alaska.

13              THE COURT:  But she hasn't been there for 23 years,

14   so you must have worked for --

15              JUROR:  Several, uh-huh.

16              THE COURT:  Okay.

17              MS. LOTZE:  Good morning, ma'am.

18              JUROR:  Good morning.

19              MS. LOTZE:  Can you -- when you said you had

20   previously served on a jury, I didn't catch your response.

21   Did you say it was over in superior court?

22              JUROR:  It was here.

23              MS. LOTZE:  Here in a criminal matter?

24              JUROR:  Yes.

25              MS. LOTZE:  Without telling us what the verdict was,

1   were you able to reach a verdict?

2              JUROR:  Yes.

3              MS. LOTZE:  And how long have you lived in D.C.?

4              JUROR:  All my life.

5              MS. LOTZE:  All right.  Thank you.

6              THE COURT:  Anything for you?  Your side?

7         Thank you very much.  If you would just go to the

8   jury office across the way, we'll be with you in a minute.

9              (JUROR 0385 LEAVES COURTROOM.)

10             THE COURT:  Okay.  Now, Gwen, we qualified 42?

11             THE DEPUTY CLERK:  Yes.

12             THE COURT:  We are going to bring them in in order.

13  And again, you're going to exercise your strikes, one for the

14  Government, two for the Defense, until you even up.  And could

15  you remind me, please, of the alternate seats?  I guess we'll

16  still go with three alternates, although I think it's a little

17  much.  But we said we would, we will.

18             Sorry, Gwen?

19             THE DEPUTY CLERK:  Alternates are 7, 13 and 4.

20             THE COURT:  Okay.  So when you get to the

21  alternates, you can strike from the panel or the box.  The box

22  or the panel, okay?

23             Gwen, we'll take a short recess, then we'll exercise

24  the strikes.  We'll give them instructions and the Government

25  will give their opening.  All right?  Bring them on in.

 1           Mr. Scarpelli called chambers last night to ask me

 2  whether I had stricken 11482.  The answer, I believe, unless

 3  someone disagrees with me, was I had stricken it, and, 725 and

 4  the new paragraphs from 721.  I do not have 17275.  I never

 5  addressed that one because I didn't have anything in front of

 6  me.  Maybe it's not an issue.

 7           MS. LOTZE:  No, it is, Your Honor.  The way we left

 8  that was the Government was going, I believe, to have it

 9  checked whether it had previously been disclosed under a

10  different name.

11           MR. SCARPELLI:  What had happened was, the

12  transcript was turned over, but it was from a -- it was two --

13  it was two calls in one.

14           THE COURT:  Yeah, it was called 17268.

15           MR. SCARPELLI:  Yeah.

16           THE COURT:  So now you've broken it down to two?

17           MR. SCARPELLI:  Broken it down, yes.

18           THE COURT:  So that should not be an issue.

19           Are there any other preliminary matters before -- or

20  questions regarding jury selection, what we're going to do

21  here?  We have one poor person all by themselves.

22           I don't know, I mean, I'm almost inclined to go with

23  two.  What do you think?

24           MR. CONTE:  I think that will be sufficient, Judge.

25           MS. LOTZE:  I think it's probable that -- to have a

1    person sitting there.

2              THE COURT:  You think we're okay?

3              MR. HAN:  We're okay, Your Honor.

4              THE COURT:  All right.  I'm surprised at how easy it

5    is to find a jury for two to three weeks without screening

6    them.  I had no idea that it would be this easy.

7              Okay.  We'll take a short recess then while she

8    collects the folks.

9              (A BRIEF RECESS WAS TAKEN.)

10             THE DEPUTY CLERK:  Everyone, please remain seated.

11   This Honorable Court is again in session.  Please come to

12   order.

13             THE COURT:  Good morning, ladies and gentlemen.

14   Welcome back.  We are ready to proceed.  At this time, ladies

15   and gentlemen, the counsel have the right to exercise strikes,

16   which means that they can exclude people they want to exclude

17   almost for any reason whatsoever, except anything that could

18   conceivably violate constitutional rights.

19             After that, we will now -- then have our qualified

20   jurors, and we'll start seating people in the box.

21             Counsel, you have a strike sheet?

22             MS. LOTZE:  Yes, Your Honor.

23             THE COURT:  Okay.  So be patient, ladies and

24   gentlemen.  You're free to read or talk among yourselves.

25   This process does not take that long, so just bear with us.

1              (PAUSE.)

2              THE COURT:  Can I see counsel at the bench for a

3    minute.

4              Excuse us, ladies and gentlemen.

5              (AT THE BENCH; ON THE RECORD.)

6              THE COURT:  Nobody asked me to strike the gentleman,

7    but I'm worried about the man who can't stay awake who's No.

8    17.  He takes a lot of medication.  He has some kind of eye

9    problem.  But is there any disagreement of the Court removing

10   him?

11             MR. HAN:  The Government has no objection.

12             MR. CONTE:  We have no objection.

13             THE COURT:  All right.  Then we're -- Gwen, we're

14   striking No. 7, so redo your little list.

15             MS. LOTZE:  Are we going to seat them before we

16   strike two alternates?

17             THE COURT:  Yeah.  There are only going to be two

18   alternates.  I'm sorry.  I left Gwen confused.

19             MR. HAN:  The alternates are 7, 13 and 4?

20             THE COURT:  There is no more 4.

21             MR. HAN:  So there's no more 4.

22             THE COURT:  Right.

23             MR. HAN:  All right.

24             THE COURT:  All right.  Thank you.

25             (OPEN COURT.)

```
 1              THE COURT:  Okay, Gwen.

 2              (PAUSE.)

 3              THE DEPUTY CLERK:  Ladies and gentlemen, when I call

 4    your jury number, I'm going to ask that you please gather up

 5    your personal belongings, bring them with you to the front and

 6    take your place in the jury box.  On the first row in the jury

 7    box, starting here on the end is seat 1 through 7.  On the

 8    second row are seats 8 through 14.

 9              Juror No. 0577, please take Seat 1.  Juror No. 0780,

10    please take Seat 2.  Juror No. 0283, Seat 3.  Juror No. 0490,

11    Seat 4.  Juror No. 0552, Seat 5.  Juror No. 0351, Seat 6.  And

12    Juror No. 0206, Seat 7.

13              Starting on the second row in the jury box, Juror

14    No. 0458, Seat 8.  Juror No. 0704, Seat 9.  Juror No. 0091,

15    Seat 10.  Juror 0304, Seat 11.  Juror 0703, Seat 12.  Juror

16    0740, Seat 13.  And Juror 0705, Seat 14.

17              (PAUSE.)

18              THE DEPUTY CLERK:  Juror 0705 in Seat 14, let me ask

19    you to please return to the audience.  Would Juror No. 0031,

20    please take Seat 14.

21              (PAUSE.)

22              THE DEPUTY CLERK:  Counsel want to approach, Judge.

23              (AT THE BENCH; ON THE RECORD.)

24              MS. LOTZE:  Did I hear that the Government is

25    getting two strikes for the alternate?
```

1          THE COURT:  For alternates, and you get two.

2          MS. LOTZE:  It just doesn't seem like that they

3    would have the same number.  I thought it would be two and

4    one.

5          THE COURT:  I've always given equal number for

6    alternates, always.  You can do it within the panel or the

7    box.

8          MS. LOTZE:  Okay.

9          THE COURT:  Okay.  You know who they are.

10         MR. HAN:  We exercise them both at the same time,

11   our two and their two.

12         THE COURT:  No, one, one --

13         MS. LOTZE:  No, it's too late.

14         THE COURT:  Oh, wait.  It's too late.

15         MS. LOTZE:  Because we both -- we did our two, which

16   is what we thought we had.

17         THE COURT:  And they got two.

18         MS. LOTZE:  So they've gotten to preview our two.

19         THE COURT:  You already gave it to them?  They

20   should go first.

21         MR. HAN:  I believe that's correct.

22         THE COURT:  Why don't you go first and then start

23   back.

24         MR. HAN:  We are fine, right?  There's no more?

25         THE COURT:  You are passing?

1          MR. HAN:  We thought we had one and we passed.

2          THE COURT:  Okay.  All right.  Then you're --

3          MS. LOTZE:  But we had already given -- they see our

4     two.

5          THE COURT:  Yeah, but they don't have anymore --

6     because they passed.  They don't have anymore strikes.

7          MS. LOTZE:  Passed again?

8          THE COURT:  So we have only two off the -- right

9     there.  That's fine.  You got it.

10         MR. HAN:  We've already struck.

11         THE COURT:  All right.  Very good.  All right.

12         (OPEN COURT.)

13         THE DEPUTY CLERK:  Would Juror No. 0740 in Seat 14

14    please return to the audience.  Juror No. 0015 in the

15    audience, please take Seat 13.  0015.

16         THE COURT:  Ladies and gentlemen on my left, is

17    there anyone who has a hardship that they did not bring to our

18    attention, they feel they need to?  No one.  Okay.

19         Counsel, anything further from either side?

20         MR. SCARPELLI:  No, Your Honor.

21         MS. LOTZE:  No, Your Honor.

22         THE COURT:  Mr. Conte?

23         MR. CONTE:  No, Your Honor.

24         THE COURT:  Okay.  Ladies and gentlemen in the jury

25    box, you have been selected as jurors in this case.  Those in

1  the audience, we thank you very much.  We appreciate your

2  patience and your service.  You should check out now through

3  the jury box -- jury office.  Sorry.  Have a good day.

4           THE DEPUTY CLERK:  Thank you.

5           THE COURT:  Everybody get everything from the

6  audience.  You haven't left any coats or anything back there?

7  All set?

8           Okay.  What I propose, if it's all right with

9  counsel, since we did take a break and the jury's probably

10  okay, to give some preliminary instructions.  The Government

11  gives their opening, we'll break for lunch, and then Defense

12  counsel.

13          MR. HAN:  Your Honor, we just need about five

14  minutes before opening to set up the computer.

15          THE COURT:  Fine.

16          MR. HAN:  We can do instructions and break.

17          THE COURT:  Why don't I -- are we ready to swear the

18  panel?

19          MR. CONTE:  That's fine.

20          THE COURT:  Go ahead, Gwen.

21          THE DEPUTY CLERK:  Ladies and gentlemen in the jury

22  box, I'm going to ask that you please rise and raise your

23  right hand.  Big smiles.

24          THE COURT:  She's great.  Do whatever she tells you.

25          (JURY SWORN BY THE DEPUTY CLERK.)

1          THE DEPUTY CLERK:  Thank you.  You may be seated.

2          THE COURT:  You've been training so many people,

3   you're getting rusty.

4          THE DEPUTY CLERK:  I know my own self.

5          THE COURT:  Ms. Franklin has been doing this many

6   years, but they've been putting her in a training capacity, so

7   other people have been doing these tasks for her, and I notice

8   her oath has gotten rusty.

9          Ladies and gentlemen, let me start by telling you a

10  bit about this case and what we are going to be doing here.

11         These instructions are not meant to be a substitute

12  for the instructions that I'm going to give you at the end of

13  the case, but they are intended to give you some sense about

14  what's going to be going on here in the courtroom over the

15  next week or two.

16         When you took your seats, you probably see somewhere

17  around there a notebook and pencil waiting for you.  It is my

18  practice to allow you to take notes during the trial if you

19  want to, and you can have your notes with you during your

20  deliberations.  I want to emphasize that none of you is

21  required to take notes.  Indeed, you should not do so if you

22  think that note-taking will distract your attention from the

23  evidence or the testimony of the witnesses.

24         On the other hand, if you think that taking notes

25  might help you remember the testimony of the witnesses and the

1   other evidence in the case, or it might make you pay more

2   attention during trial, you are free to take notes.

3          You should remember that your notes are only an aid

4   to help your memory.  They should not replace your memory of

5   the evidence.  Those who do not take notes should rely on

6   their own memory of the evidence and should not be influenced

7   by another's notes.

8          Now, whenever there's a recess, if you just kindly

9   leave your notebooks and pencils on your seats or under your

10  seat.  No one, including myself, will ever look at your notes.

11  At the end of the trial, when you come back to the courtroom

12  to deliver your verdict, your notes will be taken and

13  destroyed, and no one, including myself, will ever look at

14  them.

15         Now, as you can see that there are 14 of you seated

16  in the jury box.  We're required in any criminal case to have

17  at least two alternates.  The alternate seats were selected

18  randomly before you walked into the courtroom, so it is my

19  practice not to disclose the alternate seats to you.  We often

20  need our alternates and therefore I ask that all of you view

21  yourself as full-fledged jurors and give us all your

22  attention.  And I can assure you the seats are not the last

23  two seats or the first two seats.  They are just randomly

24  chosen.  As I say, I do not disclose those seats until the end

25  of the case.  So please, pay careful attention.

1            Now, at the beginning of the jury selection process,

2    you were given lists of individuals whose names might be

3    mentioned or who are potential witnesses in this case.  If at

4    any time during the trial you should suddenly realize that you

5    recognize or might know a witness, lawyer, or someone referred

6    to in the testimony or evidence, or anyone else connected with

7    the case in any way, please tell us by telling my courtroom

8    clerk or myself about your discovery.  Do not discuss it with

9    your other fellow jurors, but if you do see someone you know,

10   just raise your hand, and we'll address you individually.

11           Now, I'm going to explain some of the procedures

12   which we will follow and some of the rules of law which will

13   be important here.  You already know this is a criminal case,

14   and it began when a grand jury returned what's called a one

15   count indictment.  The two assistant United States attorneys

16   here are Mr. Scarpelli and Mr. Han, and they will present the

17   evidence in support of the charges in the indictment.

18           As you know, the defendants in this matter are

19   Lonnell Glover and Christopher Wright.  They have been charged

20   in a one count indictment charging conspiracy to distribute

21   and possess with intent to distribute -- sorry -- 5 kilograms

22   or more of cocaine.  The indictment, as I say, reads as

23   follows:  From on or about some time in February 9th, 2007,

24   the exact date being unknown to the grand jury, and continuing

25   thereafter up to and including at least June 19, 2007, in the

District of Columbia, District of Maryland, Southern District

of Alabama, Southern District of Florida and elsewhere,

Lonnell Glover and Jonathan Wright, also known as John and

also known as John John, did unlawfully, knowingly and

intentionally combine, conspire, confederate, and agree

together and with others known and unknown to the grand jury

to unlawfully, knowingly, and intentionally possess with

intent to distribute and distribute a mixture and substance

containing a detectable amount of cocaine, a Schedule II

narcotic drug controlled substance and the quantity of said

mixture and substance was 5 kilograms or more in violation of

Title 21, U.S. Code, 841(a)(1) and 841(b)(1)(A)(ii).  That is

the indictment, and that is what it says.

You should understand clearly that the indictment

that I have just read is not evidence.  It is just a formal

way of charging a person with an offense in order to bring him

to trial.  You must not think of the indictment as any

evidence of the guilt of Defendants or draw any conclusion

about the guilt of the Defendants just because they have been

indicted.  And even though there are two people being tried

together in this case, you must consider the evidence offered

against each of them on an individual basis.  That means that

each one of the Defendants here is entitled to have the

charges against them considered by you as if each were having

a separate trial.

1        At the end of the trial, you will have to decide

2   whether or not the Government's evidence presented has

3   convinced you beyond a reasonable doubt that defendants

4   committed the offense with which they are charged.  They have

5   been charged, as I told you, with conspiracy to distribute and

6   possess with intent to distribute cocaine, also called powder

7   cocaine in this case.  Correct, not crack.

8        And the Government will have the burden of proving

9   each of the elements of the offense -- which I will tell you

10  more about later at the end of the trial -- beyond a

11  reasonable doubt.

12       The -- now, I will be referring to the Government

13  and Defendants here.  When I mention the Government, I am

14  referring to the two Assistant United States attorneys who

15  will be presenting evidence in support of the charges.  As

16  I've told you, one is Mr. Anthony Scarpelli, the other is John

17  Han.  And then when I refer to the Defendant or Defense, I'm

18  referring either to Mr. Glover or his counsel, Mr. Conte, or

19  Mr. Wright and his counsel Ms. Lotze.

20       As the first step in the trial, the Government and

21  Defendant will have an opportunity to make opening statements.

22  The Government must make an opening at the beginning of its

23  case, and as I said, we'll take that up just before lunch.

24       Defendants may make an opening statement, or their

25  counsel, after Government's opening or may wait until the

1   beginning of the Defendants' case or they don't have to make

2   an opening statement at all.   Each Defendant will choose when

3   to make that opening and whether to make one.

4          The opening statements are only intended to help you

5   understand the evidence which will be introduced.   In other

6   words, opening statements, like closing arguments, and the

7   questions of counsel, they are not evidence.   What is evidence

8   is what you will hear under oath from the witness stand, any

9   exhibits which will be admitted into evidence, and this

10   afternoon we will be providing to you your own book of

11   exhibits, so everybody will be able to follow along.   You can

12   take notes in your exhibit book.

13          We will, as you will find out shortly, be hearing a

14   lot of wiretaps and so the transcripts, which are the -- of

15   these wiretaps will also be included in the book.   But as I'll

16   tell you more, in more detail later, it is the tape itself is

17   the evidence.   The transcript is just to help you understand

18   what's being said.   And if you hear something different, it's

19   what you hear, not what you see on the piece of paper.

20          After opening statements, the Government will

21   introduce evidence in support of its charges.   Thereafter,

22   Defendants may present evidence, but they are not required to

23   do so.   The law does not require a Defendant to prove his

24   innocence or produce any evidence.

25          At the end of all the evidence, each side will have

1    the opportunity again to appear before you and make closing

2    arguments.  Closing, just like openings, are not evidence.

3    They are intended only to help you understand their

4    contentions and the evidence.

5           Finally, at the end of all of the evidence and

6    closing arguments, I will give you jury instructions orally as

7    well as in writing that tells you what you must do during your

8    deliberations and what the law is.  Your verdict must be

9    unanimous, that is, all 12 jurors will have to agree.

10          Now, I would like to briefly describe my

11   responsibilities and yours in the jury.  My responsibility is

12   to conduct this trial in a fair, efficient and -- manner and

13   rule on legal questions which come up in the course of the

14   trial and instruct you about the law which applies to this

15   case.  It is your sworn duty to accept and apply the law as I

16   state it to you.

17          Your responsibility, ladies and gentlemen, is to

18   determine the facts.  You and only you are the sole judges of

19   the facts.  You will determine the weight, the effect and

20   value of the evidence, as well as the credibility or

21   believability of the witnesses.

22          You must consider and weigh the testimony of all

23   witnesses who appear before you.  You alone must decide

24   whether to believe a witness and the extent to which a witness

25   should be believed.  You must pay careful attention to the

1  testimony of all witnesses because you will not have any

2  transcripts or summaries of the testimony available to you

3  during your deliberations.  You must rely entirely on your

4  memory and your notes, if you choose to take any.  Although we

5  have a very able reporter taking down everything that is being

6  said, please remember we are not in a position to give you

7  transcripts or the summaries of witness testimony, so I urge

8  you to pay careful attention, to listen and watch the

9  witnesses.

10        Now, during the course of the trial, I may rule on

11  motions and objections by the lawyers, comments to lawyers,

12  questions to witnesses, and instruct you on the law.  You

13  should not take any of my statements or actions as any

14  indication of my opinion as to how you should decide the

15  facts.

16        If you think, somehow, I've expressed or even hinted

17  at an opinion as to the facts in this case, you must disregard

18  it.  That is because the verdict here is your sole

19  responsibility, not mine.

20        You may consider only the evidence properly admitted

21  at trial.  This will include the sworn testimony of witnesses

22  and exhibits.  The -- if there is any other evidence that's

23  admitted in trial, such as a stipulation, I will inform you

24  when it happens.

25        If the Court or lawyer makes a statement or asks a

1  question that refers to evidence that you remember

2  differently, it will be your memory which shall control here.

3          Now, you will find, during the course of the trial,

4  lawyers on one side or the other may object to a question or

5  an answer given.  You should not be prejudiced against the

6  lawyer who makes the objection or the party he represents or

7  she represents.  Indeed, it is the lawyer's responsibility to

8  object to evidence which he or she believes not properly

9  admissible.

10          If I sustain an objection to a question asked by a

11  lawyer, you must forget about the question because the

12  question is not evidence.  You must not guess or speculate

13  what the answer to the question would have been.  If a

14  question is asked and answered and I then rule that the answer

15  should be stricken from the record, you must forget about both

16  the question and the answer that was stricken.  You should

17  follow this same rule if any of the exhibits are stricken.

18          Now, as I told you before, and I'll remind you again

19  and again at the end of the case, every defendant in a

20  criminal case is presumed to be innocent.  This presumption of

21  innocence remains with the defendant throughout the trial

22  unless and until he is proven guilty beyond a reasonable

23  doubt.  The burden rests only on the Government to prove a

24  defendant guilty beyond a reasonable doubt, and that burden of

25  proof never shifts throughout the trial.

1    The law does not require a defendant to prove his

2  innocence or produce any evidence.  If you find that the

3  Government has proven beyond a reasonable doubt every element

4  of the offense with which Defendant is charged, it will be

5  your duty to find him guilty.  On the other hand, if you find

6  the Government has failed to prove any element of the charged

7  offense beyond a reasonable doubt, you must find Defendant not

8  guilty.

9    Now, you, as I told you a moment ago, may hear

10  certain tape-recorded conversations which were obtained

11  through the use of wire interceptions, commonly referred to as

12  wiretaps.  The term "intercept" means to obtain the contents

13  of any wire or oral communication by using an intercepting

14  device.  Anybody who watches *The Wire* knows about this.

15    The wire interceptions, or wiretaps in this case,

16  were court ordered, that is, they were approved by a judge and

17  the Government's use of them is lawful in this case.

18    Are we -- there are no consensual tapes?

19    MR. HAN:  Not that I know of.

20    THE COURT:  Now, you should not be influenced by the

21  nature of the charges in arriving at your verdict.  Your

22  responsibility here is to decide the case solely on the

23  evidence presented in the courtroom.  As a result, you are not

24  allowed to conduct any independent investigations of your own,

25  that includes going to visit any scenes.

1          Please, we have had enormous problems with internet.

2     You are not to look anything up on the internet.  I don't want

3     you researching any of these people out here, any of the

4     witnesses.  Some of you may understand various court systems.

5     Don't go on the internet and try to define terms.  Please.

6          And don't Twitter your friends.  I cannot tell you

7     how many trials get ruined by people sitting on the jury and

8     saying, "Guess what I'm doing right now?"  If we find out

9     about it, we have to start all over again.  So, please, people

10    are not deprived of their phones, but you just cannot use them

11    in any way to either help your knowledge base about the case

12    or to fill in gaps.  There will be gaps.  You have to live

13    with it.  And it's up to the lawyers to tell you what they

14    believe you should know, and it's not up to you to supplement

15    your knowledge by going out and researching things.

16         The problem has become extreme, and it's very costly

17    to the system, and it's unfair to the parties and the lawyers.

18    So if people violate that rule, they will pay the

19    consequences.  I have to say that up front.  It's just too

20    serious.  I mean, people go on and what they can research now

21    was just unknown five years ago, and it isn't fair to the

22    process.  The process is designed to have you make your

23    decision based on properly admitted evidence which I believe

24    should be admitted in court.  So kindly, you know, do whatever

25    you want to do, but don't look on this -- on an internet or go

1    out and do research.

2           Also, if there's anything in the newspaper about

3    this trial -- I don't anticipate that -- you cannot read it.

4    You have to just put it away.  You're not, in fact, allowed to

5    talk to anybody about what goes on in here until you are

6    allowed to talk among yourselves about the case at the end of

7    my instructions.  So nobody should be talking about what goes

8    on during the case, even among yourselves, with family,

9    friends or anybody else until my final instructions when I

10   tell you to begin your deliberations, and then you're only

11   allowed to talk about it in the jury room.

12          Really, most trials go just swimmingly until some

13   juror does something really dumb, and I just want to urge you

14   to work with us here because we'll try our best to make your

15   stay here enjoyable.  And we have breakfast for you in the

16   morning.  It will be ready at 9:00 o'clock.  We are sitting --

17   our hours of trial go from 9:30 to approximately 4:30, quarter

18   of 5:00.  Today we end before 4:30 because I have to be in a

19   meeting at 4:30.  We are sitting Friday.  I expect that we

20   will move fairly quickly.  We've already moved fairly quickly.

21          If you need anything, Ms. Franklin will be happy to

22   address that.  She's really good.  If you don't like the

23   breakfast, there's not much we can do about it.  Eat at home.

24          We'll have water, and we'll show you the jury room.

25   But in any case, so as I say, if there is any press about

1    this, ignore it.  I don't expect it.  If anybody tries to talk

2    to you about this case, I don't expect that either, you just

3    say, "No, sorry, I can't talk about it."

4         You might see these people in the hall.  You can't

5    talk to them.  It's not because they're rude, but they are

6    told that they can't talk to the jurors.  The most they can

7    say is "good morning," "good afternoon," that's about it.  So

8    you just -- we don't have a system in the courthouse to keep

9    everybody, you know, separate and apart, so you may see one of

10   these people in an elevator.  Just ignore them.

11        Anyways, as I say, you cannot discuss the case until

12   the end of my final instructions.  The -- if anybody should

13   try to talk to you about the case, please, just tell us, tell

14   Ms. Franklin or the marshals.  Don't discuss it with your

15   fellow jurors.

16        It's important to keep an open mind here.  Wait

17   until you hear all the evidence and the instructions on the

18   law before you make up your mind.  And we thank you very much

19   for your service.

20        We are going to take about five minutes just to show

21   you your new digs and to allow them to set up the equipment.

22   Then we'll break for lunch.  We take, usually, a morning

23   break, an afternoon break, and a luncheon break sometime

24   around 12:30 or quarter to 1:00.

25        Any questions about procedures?  Don't leave things

1   in the jury room.  Keep them with you.

2           Yes?

3           JUROR:  How long is this trial going to take?

4           THE COURT:  I'd say -- they think they will finish

5   in two weeks, right, testimony.  But I can't tell you how long

6   it will take you.  But we will sit this Friday, and we can

7   discuss more if there are any other -- I'm not aware of any

8   other real scheduling interferences.  I was just looking at

9   the calendar.

10          All right.  The only interference I'm aware of is I

11  have to leave for a meeting today.

12          Yes.

13          JUROR:  I assume that we can tell our workplaces

14  that we have to serve on jury duty.  If we have clients we are

15  expected to communicate with, we can just tell them I'm on

16  jury duty and see you whenever.

17          THE COURT:  Yes.  Absolutely.  I mean, of course you

18  have to tell family and friends what are you doing, then they

19  will become suspicious.  But you just can't discuss the

20  substance of the case.  You can tell them what ties those guys

21  are wearing or anything like that.  But, right, absolutely.

22          Okay.  We'll show you the jury room.  This is where

23  you'll be reporting to from now on.

24          Thank you, ladies and gentlemen.  We appreciate your

25  service.  It's a great exercise of democracy.  You wait and

1    see.

2              (JURY LEAVES COURTROOM.)

3              (A BRIEF RECESS WAS TAKEN.)

4              THE COURT:  Okay.  Yes.  All right.  We are on the

5    record.

6              MS. LOTZE:  Your Honor, I had intended in my opening

7    to -- what I would like to say in my opening, among other

8    things, is to sort of get out in front of and distance

9    Mr. Wright from the 404(b) evidence concerning the PCP and

10   heroin sales in this way.  I had anticipated saying something

11   along the lines of --

12             THE COURT:  It's not 404(b) evidence, though, by the

13   way.  Okay.  I think we have to figure out exactly how that

14   evidence is going to be used.  It certainly is allegedly the

15   source of Mr. Glover's money.

16             MS. LOTZE:  Right.

17             THE COURT:  But it doesn't -- it's not -- are you

18   going to say it's proof -- try to argue it's proof against

19   Mr. Wright?

20             MS. LOTZE:  No.  And that's not my concern.  My

21   concern is this.  I wanted to say, you know, to the extent

22   that you hear evidence of Mr. Glover's activities as far as

23   they relate to distribution of PCP and heroin, those issues

24   aren't before you today.  Don't hold any ill will you have

25   against Mr. Glover for what you're going to hear against

 1  Mr. Wright.  And what I had -- what I was just asking

 2  Mr. Scarpelli, whether the Government intended to introduce

 3  any evidence that Mr. Glover was, in fact, you know,

 4  prosecuted for those crimes, because then I could say

 5  something further which is, you know, you don't have to worry

 6  about that.  He's separately, you know, being prosecuted for

 7  those crimes.  And the Government says no, they don't have any

 8  intention of doing that, so --

 9        THE COURT:  Okay.  Unless he takes the stand, my

10  understanding is that his prior convictions, Mr. -- your

11  client has none.  Mr. Glover's prior convictions are not

12  coming out.  You are going to use that evidence and we are

13  going to have a limiting instruction that it's admissible

14  against him, Mr. Glover.

15        MS. LOTZE:  I guess --

16        THE COURT:  Wait a minute.  Wait.  Let's hear it.

17        MR. HAN:  Your Honor, our theory, as we said before,

18  is that Mr. Glover's PCP and heroin sales are the source of

19  the money that the conspiracy, which includes --

20        THE COURT:  Yes.

21        MR. HAN:  -- was going to use to buy the cocaine.

22  So, to say that it is admissible only against Lonnell Glover,

23  I think, is not really accurate because the conspiracy

24  couldn't go forward without this money that conspiracy --

25        THE COURT:  I understand that.  But it is not being

1    offered to prove that Mr. Wright in any way was engaged in PCP

2    or other drug sales, heroin.

3         MR. HAN:  I think it is fair for us to say, or the

4    Court to say, that the Government is not suggesting that

5    Mr. Glover -- Mr. Wright was involved in the PCP and heroin

6    business of Mr. Glover's.

7         THE COURT:  Well, I just want -- I want to have an

8    instruction that makes that clear.  It is part and parcel, in

9    a sense, of the conspiracy.

10        MS. LOTZE:  Right, that's --

11        THE COURT:  But it isn't evidence that Mr. Wright

12   did anything with heroin or PCP.

13        MS. LOTZE:  And that's actually not the -- that's

14   not my immediate concern.  My immediate concern, the reason I

15   bring it up is, I understand the Government doesn't intend to

16   introduce evidence of his being bribed separately, or even

17   just his separate trial.  But it occurred to me that perhaps

18   in cross-examining Agents Pardee and Bevington, who've

19   testified at those other trials, you know, Mr. Conte might

20   make something of it.

21        So, I'm just wondering whether I'll have any basis

22   on which to say that Mr. Glover either is being or has been

23   prosecuted separately for those offenses, which is something I

24   would like to say just in order to get the jury not to think

25   about it in connection with this case.

1          MR. CONTE:  Let me put my two cents in here, Judge.

2     I intend to bring it up in my opening that there was a

3     separate PCP investigation and that some of that evidence is

4     coming in -- is coming in.  I need to fill in a picture not

5     against Mr. Glover as cocaine -- and that's the limiting

6     instruction we'll be seeking.  But to the extent that the PCP

7     conspiracy is intertwined with the cocaine conspiracy or that

8     they are introducing evidence of the PCP conspiracy to put it

9     in perspective, I'm going to make comment to that.  I'm not

10    going to make any comment as to there being a separate trial.

11    I will make a comment that that's for another judge on another

12    day, and I think that's as far as I intend to go.

13         THE COURT:  I'll tell Judge Hogan.  He'll be

14    thrilled.

15         MR. HAN:  I think that we're -- it's going to come

16    out that this case started with a PCP and heroin investigation

17    that led into the cocaine investigation.

18         THE COURT:  But we're not -- and no one wants to

19    illicit, to answer Ms. Lotze's question.

20         MR. HAN:  To answer Ms. Lotze's question, the

21    Government does not intend to indicate that any charges were

22    filed in the PCP or heroin case --

23         THE COURT:  Or tried.

24         MR. HAN:  -- or went to trial.  You know, that's our

25    current intention.

1     THE COURT:  And you're going to indicate what?  It

2  led to an investigation.

3     MR. CONTE:  That there is a PCP investigation or

4  case and it's --

5     THE COURT:  You can do that, I think.  I mean, do

6  you mind?

7     MR. HAN:  Not that there was an investigation, but

8  we're not going to mention anything that there was anything --

9  there was no charges, there's no indictment in those cases.

10  We are not going to mention any court proceedings related to

11  it, but I think it is fair --

12     THE COURT:  Is that your position too, no court

13  proceedings will be mentioned as part --

14     MR. CONTE:  No.  I am going to say that that's for

15  another judge on another day --

16     THE COURT:  Okay.

17     MR. CONTE:  -- which I think is a fair statement.

18     THE COURT:  A little bit close to the line because

19  it isn't for another judge for another day.  It's already

20  happened.

21     MR. CONTE:  Sentencing hasn't happened yet.

22     THE COURT:  Yeah, but we don't -- I'm a little

23  troubled because it's a little bit misleading.  I wouldn't,

24  you know, mislead them.  I would leave that sentence out, that

25  that proceeding has nothing to do with you here, ladies and

1  gentlemen.  I wouldn't say it's for another day for another

2  judge.  It's already happened.

3      MR. HAN:  In other cases, what the Government --

4  I've seen this, I think to the satisfaction of both parties,

5  is at the end of the trial, you could have a jury instruction

6  that simply says something to the effect of, Mr. Glover's PCP

7  and her heroin activity is not before you --

8      THE COURT:  Yeah.

9      MR. HAN:  -- and you're not to speculate as to what

10  happened or to consider that.

11      THE COURT:  Or what might happen.

12      MR. HAN:  Or what might happen or the legal

13  ramifications, period.  And to the extent that no party opens

14  the door about charges being filed or an indictment being

15  issued in those cases, I think that will suffice for the

16  Government.

17      THE COURT:  Fine.  Well, I think that in sentencing,

18  that's for a judge for another day, that that isn't an issue

19  before you, ladies and gentlemen.  All right.  I don't feel

20  comfortable having you say something that to me is arguably

21  not accurate, and we all know it.  Okay?

22      MR. CONTE:  Very well.

23      THE COURT:  All right.  Are we ready to go?  Okay.

24      THE DEPUTY CLERK:  Ready, Judge.

25      THE COURT:  Yeah.

1          (PAUSE.)

2          (JURY PRESENT.)

3          THE COURT:  Okay.  Everybody comfortable?  Fine.

4          You ready, Mr. Scarpelli?

5          MR. SCARPELLI:  Yes, Your Honor.

6          THE COURT:  Okay.  Go ahead.

7          MR. SCARPELLI:  May it please the Court, defense

8   counsel.

9          Ladies and Gentlemen of the Jury, good afternoon.

10  Mr. Lonnell Glover was a large-scale drug supplier in the D.C.

11  area.  He lived in Temple Hills, Maryland, and he sold drugs.

12  He predominantly sold PCP and heroin, and from his PCP and

13  heroin business, he decided to branch out and sell cocaine.

14  And how is he going to do that?

15          Mr. Glover -- excuse me -- had a friend, Robert

16  Robbins.  His nickname was Country and Rabbit.  He lived in

17  Alabama.  Mr. Glover knew that Mr. Robbins had drug

18  connections, and in order to advance into the cocaine

19  business, he contacted Mr. Robbins.

20          Mr. Robbins agreed to assist Mr. Glover in obtaining

21  cocaine, and Mr. Robbins put Mr. Glover in touch with Jonathan

22  Wright, also known as John John and John.  Mr. Robbins

23  referred to Mr. Wright as his nephew.

24          Mr. Wright was living in south Florida and had a

25  connection in the Bahamas.  His connection in the Bahamas was

going to get the group multiple kilograms of cocaine, and the

connection was an individual identified only as Foots.

How did this case begin?  This case began with the

FBI.  They began investigating an individual by the name of

Anthony Suggs.  Anthony Suggs was selling PCP in the District

of Columbia.  And in order to advance the investigation, the

FBI obtained court-approved wiretaps on Anthony Suggs'

telephone.  They listened to criminal conversations in order

to advance their investigation into Mr. Suggs selling PCP.

And very quickly, from those wiretap intersections, the FBI

realized something.  Mr. Suggs was being supplied his PCP by

Mr. Glover.

So, in advancing the investigation, the FBI obtained

approval to listen to the criminal conversations over Lonnell

Glover's cellular telephone.  And through those conversations,

a few things became apparent.

One, that Mr. Glover was, in fact, supplying

Mr. Suggs with PCP.  Two, that Mr. Glover was selling PCP and

heroin in the District of Columbia.  Three, that Mr. Glover

had planned to use the profits he was making from his heroin

and PCP business to obtain approximately 20 kilograms of

cocaine through Mr. Wright and the Bahamian connection Foots.

And finally, Mr. Glover used his pickup truck as an important

tool in advancing his drug distribution business.  And when I

say "an important tool," what Mr. Glover did was he, one, used

1   the truck to transport drugs, but more importantly, he

2   conducted drug business inside the truck.

3        And with this information, the FBI obtained court

4   approval to place a listening device inside of Mr. Glover's

5   pickup truck.  And from that listening device, you're going to

6   hear some of the most incriminating conversations in this

7   case.

8        And the Judge before had mentioned the wire, and

9   everybody knows about the wire.  And the interesting thing

10  you'll hear, you're going to hear telephone conversations from

11  Mr. Glover's phone, and then you're going to hear

12  conversations from within the pickup truck.  And like as in

13  the wire, everybody knows that there's the possibility that

14  the police are listening to your phone calls, and you're going

15  to hear in these phone conversations that the co-conspirators

16  and Mr. Glover speaking code, or they speak cryptic.  They

17  speak in very, very short conversations, because there is

18  always the possibility, as on the wire, the police are

19  listening.

20       But the difference you're going to see is in the

21  truck activations, because they never thought that there was

22  the ability for the Government or the FBI to obtain approval

23  to have a listening device inside the truck.  And from there,

24  you're going to see some of the most powerful evidence in this

25  case.

1           So, in March of 2007, Mr. Glover contacted Robert

2    Robbins, and over the telephone that the FBI was listening to,

3    in cryptic fashion, he told Mr. Robbins he needed to meet him.

4    And Mr. Glover flew down to Evergreen, Alabama around

5    April 20th, and he met with Mr. Robbins.  And during that

6    meeting, they discussed obtaining approximately 20 kilograms

7    of cocaine.

8           And, thereafter, Mr. Glover flew to Fort Lauderdale.

9    He had Mr. Robbins pick him up at the airport, and they met

10   Mr. Wright and Foots, and there they discussed the drug deal.

11   And Foots was in the Bahamas and was going to obtain

12   approximately 20 kilograms of cocaine for Mr. Glover, and then

13   get it, with the assistance of Mr. Wright and Mr. Robbins, to

14   the U.S. to ultimately be sold in, among other areas, D.C.

15          I'm going to play you a short piece of a truck

16   activation, and you're going to hear a conversation which

17   occurred on May 4th.  Now, this conversation is shortly after

18   Mr. Glover had come back from meeting Mr. Robbins, Mr. Wright

19   and Foots when they were ironing out this drug deal.  This is

20   a conversation between Christian Donaldson, who's a

21   co-conspirator, and Lonnell Glover.  And they are inside

22   Mr. Glover's truck, and they are talking about the drug deal.

23   And during the conversation, which I'm going to play you a

24   clip of, you're going to hear the term "water."  Mr. Glover

25   refers to water.  And when he's referring to water, you're

 1   going to learn in this case, that's a common name for PCP.

 2          And Mr. Glover is going to say, "I need to get my

 3   money out of the water in order to buy the Coke."  And then

 4   you're going to hear later on in the conversation Mr. Glover

 5   says, "I got this boy in Alabama," and he goes on to say, his

 6   nephew is going to assist with the drug deal.  And,

 7   ultimately, you'll hear him say that the connection is in the

 8   Bahamas.  And at the very end, you're going to hear Mr. Glover

 9   say that the nephew is 32 years old.

10          Can we play Truck Activation 604.

11          (TAPE ACTIVATION 604 PLAYED.)

12          THE COURT:  Ladies and gentlemen, there's a

13   transcript flipping up on the scene right now, right?  Is that

14   what I -- yes.  Okay.  I just want you to know that the

15   evidence is not the transcript.  They've tried to come up with

16   a transcript that, as best as I can tell, reflects what's

17   being said.  But if you hear this tape differently, it's what

18   you hear.  The evidence is the bug itself, not the transcript

19   that's been prepared just to help you.

20          Okay.  Go ahead.  Sorry.

21          (TAPE ACTIVATION 604 CONTINUED PLAYING.)

22          MR. SCARPELLI:  In that conversation, you're hearing

23   Mr. Glover talk about his man.  His man is Robert Robbins, and

24   his nephew is Mr. Wright.  The Bahamian connection is Foots,

25   and you're going to learn that in this trial.

1          Around May 23rd of 2007, in furthering the drug

2     transaction, Mr. Glover, Mr. Wright had to get the money from

3     the D.C. area to South Florida.  Mr. Wright drove up in a

4     rented van, and he went to Mr. Glover's residence.  And you're

5     going to hear a series of telephone calls where Mr. Wright is

6     telling Mr. Glover his location as he drives up.

7          And then on May 23rd, when Mr. Wright and

8     Mr. Glover, together in D.C., they're inside Mr. Glover's

9     pickup truck, and there's a conversation, and you're going to

10    hear this conversation.  And I'm going to play you a clip of

11    it.  But essentially, what you're going to hear is you're

12    going to hear Mr. Glover talking about obtaining kilos of

13    cocaine.  And at one point, you're going to hear Mr. Wright

14    say, "The guys don't like to do just one or two keys."

15          Can we play 721?

16          (TAPE ACTIVATION 721 PLAYED.)

17          MR. SCARPELLI:  Shortly after that conversation,

18    Mr. Wright and Mr. Glover went to Lowe's in Maryland.  And

19    they went to Lowe's in Maryland to purchase some items to hide

20    the money inside the rented van.  And one of the items that

21    they purchased was a roll of black electrical tape.  And the

22    electrical tape was used in order to hide the money.

23          Mr. Wright then drove the van back down to South

24    Florida in order to take the next step in obtaining the

25    cocaine.

1          Sometime around May -- May 28[th]ish, Mr. Glover

2     flew to South Florida and met Mr. Wright, and they advanced

3     the plan.  They obtained a microwave oven, and the plan was to

4     hide $175,000 inside the microwave, wrapped in black

5     electrical tape, and then to have a courier by the name of

6     Cardinal Marshal carry the microwave onto a commercial flight

7     destined for the Bahamas.

8          Thereafter, Mr. Wright and Mr. Glover took another

9     flight to the Bahamas to wait for Cardinal Marshal to deliver

10    the money in order that they could then obtain the

11    approximately 20 kilos of cocaine.

12         The plan had a misstep, though.  TSA X-rayed the

13    microwave.  And using the L3 X-ray machine, on June 2nd,

14    2007, TSA was alerted that there was something inside the

15    microwave.  They pulled the microwave off, pulled Mr. Marshal

16    off the flight, and searched the microwave.  And inside the

17    microwave was $175,000 in cash, and several of the bundles of

18    money were wrapped in black electrical tape.

19         Thereafter, Mr. Glover and Mr. Wright returned to

20    the United States, South Florida, and discussed what happened

21    to the money.  But before they discussed that, Mr. Wright made

22    a telephone call to Foots in the Bahamas to tell him that

23    Mr. Wright and Mr. Glover got home safely.

24         Can we play activation 14833.

25              (TAPE ACTIVATION 14833 PLAYED.)

1     MR. SCARPELLI:  John made it home safe.  What

2   Mr. Wright is telling -- passed the message on that they

3   weren't intercepted by law enforcement, although the microwave

4   was.  And then there was some communication.  You're going to

5   hear telephone calls between Mr. Wright and Mr. Glover, and

6   they're trying to figure out what happened to Cardinal

7   Marshal.

8            Can we play activation 17264.

9            (TAPE ACTIVATION 17264 PLAYED.)

10           MR. SCARPELLI:  That's a brief overview of the

11  facts.  We're going to play you several telephone

12  conversations that were recorded and some truck activations

13  that were recorded.  We have pared them down, and we've pared

14  them down because we are trying to focus on just the criminal

15  activity in this case, as well as if we played all the

16  activations, we would be here a lot longer than two weeks.

17           And I want to talk very briefly about conspiracy,

18  and conspiracy may initially hit you as this complex term.

19  But, essentially, what it is is, it's a partnership in crime.

20  It's two or more people agreeing to commit an unlawful

21  purpose.  And in this case, the unlawful purpose was to obtain

22  approximately 20 kilos of cocaine from the Bahamas, ultimately

23  destined for the District of Columbia.

24           And different co-conspirators can take different

25  roles.  Some have minor roles.  Some enter the conspiracy at

1   different times.  But the key component is the agreement, and

2   in this case, the agreement between Mr. Glover, Mr. Robbins,

3   and Mr. Wright occurred.

4            And in the end, we are going to present to you

5   evidence that Mr. Glover employed Mr. Robbins and Mr. Wright

6   to assist him to obtain cocaine from the Bahamas.  And they

7   were getting it from an individual named Foots.  Ultimately,

8   TSA intercepted the microwave oven with the $175,000, and the

9   drugs never came into the United States.

10           At the end of this case, we are going to have proven

11  to you the facts that I have just summarized for you, and

12  Mr. Han and I are going to ask you to find the Defendants

13  guilty.  Thank you.

14           THE COURT:  Okay.  So this will be a fine time to

15  break for lunch, okay?

16           Ladies and gentlemen, please, as I said before, do

17  not discuss the case.  You are free to go to lunch now.  We'd

18  ask that you be back in the jury room behind here, you come

19  directly here after lunch, at quarter of 2:00, please.

20           Have a nice lunch.  Do not discuss the case and

21  we'll proceed with Defense counsel and then some witnesses.

22           Thank you.  And we will adjourn today before 4:30.

23  Have a good lunch.

24           (JURY NOT PRESENT.)

25           THE COURT:  Okay.  Counsel, anything further?

1          Okay.  We'll be back at quarter of.  Thank you.

2          (A LUNCH RECESS WAS TAKEN.)

3          (PROCEEDINGS ADJOURNED AT 12:35 P.M.)

4                        *-*-*-*

5                **CERTIFICATE OF REPORTER**

6          I, Catalina Kerr, certify that the foregoing is a

7    correct transcript from the record of proceedings in the

8    above-entitled matter.

9

10   _____  _____

     Catalina Kerr                      Date
11